Bobby L. HARDWICK et al. and the Inmates of the Georgia Diagnostic & Classification Center, Jackson, Georgia, Plaintiffs,

v.

Dr. Allen AULT, Commissioner of Offender Rehabilitation, State of Georgia, et al., Defendants.

Civ. A. No. 74–139.

United States District Court,
M. D. Georgia,
Macon Division.

Jan. 12, 1978.

the offenses they had allegedly committed, and without being told why they were there. They were placed in the cell block for an indefinite duration and were not told what they had to do to regain entrance into the general prison populace. In some instances, even after the prison officials determined that an H–House inmate was ready to return to the general prison populace, the inmates were not transferred out of H–House because other wardens in the system would refuse to accept them. The inmates claim that the totality of the circumstances surrounding the operation of H–House constitutes a violation of the Eighth and Fourteenth Amendment.

I.

A. *Physical Setting of H–House*

H–House, the most secure cell block in the Georgia prison system (Ricketts, Vol. VII, p. 2, 41), is only one wing of a large prison, the Georgia Diagnostic and Classification Center (Diagnostic Center) in Jackson, Georgia. There are three distinct prisoner populations incarcerated at the Diagnostic Center. The largest group is composed of prisoners who are temporarily at the Diagnostic Center awaiting transfer to one of Georgia's sixteen correctional institutions. Prisoners entering the Georgia prison system are first brought to the Diagnostic Center so that they can be classified for transfer to an appropriate prison according to their past criminal record, their age, the length of their sentence, and the nature of the offense for which they are being incarcerated. This classification process is the main function served by the Diagnostic Center.

A second prisoner population at the Center is the permanent party group. These are the prisoners who maintain the prison and provide the prison services, such as laundry and food. They are at the Diagnostic Center serving their time and their conditions of confinement are not unlike those of most prisoners in the Georgia prison system.

Thomas M. West, Ralph S. Goldberg, Atlanta, Ga., Emily Calhoun, Al Pearson, Athens, Ga., for plaintiffs.

Harrison Kohler, B. Dean Grindle, Jr., Asst. Attys. Gen., Atlanta, Ga., for defendants.

OWENS, District Judge:

This lawsuit involves H–House, a large disciplinary cell block wing of the Georgia Diagnostic and Classification Center at Jackson, Georgia, which is, in effect, a prison within a prison. Problem prisoners and incorrigibles from Georgia's entire prison system are placed there under extreme restrictions and severe deprivations. The plaintiffs, past and present members of H–House, assert that they were transferred to the Diagnostic Center and placed in H–House without a hearing, without notice of

The third population in the Diagnostic Center is the prisoners confined in H–House. It is called H–House because the various wings at the Diagnostic Center are assigned letters of the alphabet, A–House, B–House, etc., and the wing in dispute in this case is H–House. H–House itself is further subdivided into ranges of the cell block called H–1, H–2, H–3, and H–4. H–1, which has become an extension of death row at Reidsville, houses only prisoners awaiting the death sentence and is not a part of this lawsuit. H–2, H–3, and H–4, which together contain seventy-nine (79) individual cells, are the subject of this lawsuit. The manner in which these three cell ranges are operated and the purpose they serve in Georgia's penal system are discussed infra, but the following is a brief description of the physical setting of these three ranges.

The most obvious feature of H–House is that it is extremely secure. Access to the wing from the rest of the prison is tightly controlled by a series of bar doors. Within the wing itself, access to each of the three subparts is controlled by entrance through a central foyer. Entrance from the foyer to H–2 is by far the most closely guarded part of H–House and contributes to making H–2 the most secure portion of the entire Georgia prison system. A control room sits above and at one end of H–1 and H–2. One can reach the control room from the foyer only by passing through an outer steel door which will open only when the inner steel door is locked and the foyer is cleared. From that point the officer entering through the outer steel door passes a key up to the officer in the control room who then in turn unlocks the door from the inside.

The control room is used to monitor the prisoners in H–2. This is accomplished in two ways. First, a closed circuit television system allows an officer in the control room to view constantly the range in front of the seventeen (17) cells on H–2. Second, from the control room an officer can walk onto a catwalk which runs above and behind the cells in H–1 and H–2. Each of the cells has a square porthole at the back center of the cell which forms a part of the ceiling of the cell. By walking down the catwalk a guard can look down into the square portholes, which are covered by metal grates, and watch the prisoners from above. In addition, the catwalk leads out to an observation platform which sits above the small exercise yard which is at the opposite end of H–House from the control room. Also, from the control room an officer can look through a glass port in the top of the shower room and watch prisoners there. Finally, the control room contains an intricate electric locking system so that prisoners in H–2 can be released from their individual cells without the necessity of an officer actually going down on the range in front of the cells.

The security precautions taken in H–3 and H–4 are similar but not as extensive. Again, entrance to the subparts from the central foyer is closely controlled through a series of locked doors and only by passing a key to an officer inside who is in a secure observation room can one gain access to the range. H–3 and H–4 do not contain catwalks, but as described below, its operation is likewise conducive to tight security. H–3 has twenty-eight (28) cells and H–4 has thirty-four (34) cells.

## B. *The Operation of H–House*

More significant than the physical setting of H–House is the manner in which H–House is operated. H–House has gone through three distinct methods of operation since its inception in 1973. During its early use, the cell block was set up as a behavior modification system in which prisoners earned points on the basis of good behavior measured by objective criteria. H–House at that time had two phases with differing restrictions and privileges in each phase. If a prisoner gained enough points because of appropriate behavior he then moved from the more restrictive first portion of H–House to the less restrictive second phase. After earning a certain number of points, the prisoner could then move back into the general prison populace.

For reasons which are unclear the first method employed in H–House was abandoned for approximately two years. During this period the conditions of confinement were the same throughout H–House and there was no officially stated, objective criteria by which a prisoner could regain admission to the general prison populace. Finally, in 1976, the warden of the Diagnostic Center reinstituted a behavior modification system which this time involved three phases, each phase with more privileges and fewer restrictions than the previous phase. Every prisoner transferred to H–House begins in the most restrictive phase regardless of the reason for his transfer. The prisoners in the first phase are housed entirely in H–2. Upon a showing of appropriate behavior the H–2 prisoner is then moved to H–3 which has better conditions, generally, than H–2. The next phase is a move to H–4 where the restrictions are fewer than in H–2 or H–3 and where privileges are greater. The final phase of the current system is transfer out of H–House back to the general prison populace at one of Georgia's several institutions.

The rules and restrictions in the respective cell blocks are as follows:

*H–2:* In this portion of H–House the rigors of confinement are extensive. The most restrictive aspect of H–2 is that the inmates are kept in their small individual cells almost all the time. Each prisoner is allowed to exercise only once a week for a two hour period. The exercise is taken alone in a small yard surrounded by high concrete walls. Each prisoner is also allowed to shower three times per week and is allowed on "run around"[1] sporadically, not exceeding, however, four hours in any one week. Thus, the typical prisoner in H–2 is out of his cell only slightly over six hours per week.

Prisoners in H–2 are not allowed to participate in the various rehabilitative programs at the Diagnostic Center. They are allowed to select three books per week from a library cart brought to the cell house with a limited selection of books. Unlike prisoners in the general prison populace, they are not allowed to watch television, but they may listen to the prison radio station if the radio mechanism in their cell functions. Finally, prisoners in H–2 are allowed to subscribe to one periodical, but they can only retain one issue in their cell at a time.

The prisoners in H–2 are constantly subject to severe security measures. In addition to being constantly under surveillance in their cell, in the shower, or in the exercise yard, they are strip searched for any movement out of H–2. During the search, two correctional officers keep "stun guns" trained on the prisoner. The stun guns deliver a non-lethal blow via a large projectile. After the strip search the H–2 prisoner is handcuffed during his absence from H–2.

The prisoners in H–2 are fed by the guards who deliver the food in carts while another guard watches with a stun gun. No guard ever goes alone down on the range in front of the prisoners. Almost all of the prison staff's communication with H–2 inmates occurs through the porthole in the top of the cell.

*H–3:* This is the portion of H–House reserved for those in the second phase of the behavior modification program. A prisoner who has graduated from H–2 moves to this less restrictive portion of H–House. The main differences between H–2 and H–3 are the greater opportunity for contact with other prisoners and the opportunity for more time out of the cell. For example, exercise is taken in groups of four about three times a week on a large, relatively open yard. Also, three prisoners are allowed out on the range on "run around" at one time. This allows more prisoners to get out of the cells with greater frequency than in H–2.

Prisoners in H–3 must also undergo strip searches before leaving the cell block, including before exercise periods. However,

---

1. "Run around" is the privilege of being allowed out of an individual cell so that one can wander around the range in front of the cells. While on "run around" prisoners can socialize. They also use this period to clean up the cell block and to take their showers.

they are not handcuffed for movements out of the cell block. With respect to showers, reading materials, and radio listening, the restrictions are the same as those in H–2.

*H–4:* This portion of the cell block is the last stage of the behavior modification program. After continued good behavior in H–4 the prisoner is supposed to be transferred back to the general prison population. However, the conditions of confinement in H–4 are not very different than H–3. The inmates in H–4 do spend more time out of their cells because they exercise as a group and are allowed out on "run around" in groups of four. Inmates in H–4 have the additional privilege of using a telephone once a month. In all other respects their restrictions are like those in H–3, including the very tight security precautions.

### C. The Purpose of H–House

Although the testimony on this point varies a great deal, the evidence showed that the most pervasive use of H–House is as punishment for prisoners who have committed various offenses within the prison system. H–House is the "jail" for prisoners who cannot conform their conduct to the rules of prison life. Secondarily H–House exists for the security of other prisoners and guards by removing from the prison populace those inmates who are a danger to prison order. Finally, H–House is for the purpose of rehabilitation because it attempts to extract from prisoners changes in their behavior. (Ricketts, Vol. II, p. 130; Vol. IX, p. 89). These are the purposes served by the state's prison within a prison.

### D. The Issues in this Case

Although several of the plaintiffs' most serious complaints were mentioned at the outset of this opinion, the following is a complete list of the matters litigated:

(1) transfer in and out of H–House,

(2) conditions at H–House,

(3) mail handling procedures,

(4) censorship of publications,

(5) visitation,

(6) procedures for handling inmate property, and

(7) access to an adequate law library. (This issue is being considered in a separate order.)

This court shall discuss each of these matters seriatim.

## II.

### A. Transfer Into H–House

Inmates are transferred to H–House regularly for disciplinary reasons without notice or being given a hearing. Approximately 90% of H–House inmates come from the state's main maximum security prison at Reidsville, Georgia. (Phillips, Vol. IX, p. 36). Warden Hopper, who is in charge of the prison at Reidsville, stated that he sends prisoners to H–House who have committed serious violations of prison rules. The Deputy Commissioner of Prisons, who directly approves Warden Hopper's requests to transfer prisoners to H–House, describes it as "a last resort." (Lowe, Vol. IX, p. 53). Warden Ricketts, who is in charge of H–House, describes transfers to H–House as "where you go to jail when you're in prison." (Vol. IX, p. 87). Warden Hopper outlined the kind of conduct for which a prisoner would be transferred to H–House as follows, "instances where an inmate has attacked an officer, taken an officer hostage or attacked other inmates." (Hopper, Vol. VIII, p. 1). Prisoners are also transferred to H–House by Warden Hopper because they appear to be leaders of militant prisoners; "You cut off the head of the snake. You eliminate violence that was being advocated by the leader." (Hopper, Vol. VII, p. 13). Warden Hopper stated that the main difference between administrative segregation at his prison and H–House is that the design of H–House allows the prison official to *isolate* the problem prisoner and thereby prevent either his militant influence, or his individual violence. *Id.*

From the above and from the entire record of this case, it is beyond question that the State of Georgia transfers prisoners to H–House in most cases for disciplinary reasons on account of alleged serious inmate

misconduct. Although no rule or regulation dictates the specific acts of misconduct for which a prisoner can be placed in H–House, the testimony of Warden Hopper, Warden Ricketts, and Deputy Commissioner Lowe makes clear that only serious deviant behavior by incorrigible prisoners precipitates a transfer to H–House.

A second aspect of transfer to H–House is that it is a disciplinary measure quite similar to placing a prisoner in solitary confinement. (Ricketts, Vol. IX, p. 90). As Warden Hopper's testimony pointed out, the main feature of H–House is that it isolates the prisoner. (Hopper, Vol. VII, p. 13). The difference between H–2 and solitary confinement is not significant. In some respects, H–2 is worse than solitary. (Ricketts, Vol. IX, p. 90). The plaintiffs' expert witness, Dr. Korn, testified that the indefinite duration of a stay in H–2 made H–House in the long run more unbearable to a prisoner than the harsh but definitely limited stay in solitary. (Korn, Vol. XI, p. 75). Furthermore, the prisoners in H–2 are locked up most of the time and have very limited contact with other prisoners. All of these conditions and the totality of the program in H–House make it a strong disciplinary measure, "a last resort", which closely resembles solitary.

The right to a hearing before being placed in solitary was established in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The state argues that no hearing is required before sending a prisoner to H–House because prisoners entering H–House are merely being transferred within the prison system. The state points to *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Montagne v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) in which the Supreme Court did not require a hearing for a transfer for disciplinary reasons from the general prison populace of one prison to the general prison populace of another pris-

on with less favorable conditions. The state argues that transfer to H–House can be fitted under this aegis. However, the facts discussed above well illustrate that transfer to H–House is in no sense a mere relocation of a prisoner. It is a transfer for serious misconduct to a punitive situation approaching solitary. In both *Meachum*, and *Montagne* the Supreme Court was careful to note that the transfers in dispute did *not* involve disciplinary confinement for specific misbehavior. This distinction has likewise been noted by the Fifth Circuit in *Bruce v. Wade*, 537 F.2d 850, 854, n. 9 (5th Cir. 1976). Thus, the facts of the instant case clearly distinguish it from *Meachum* and *Montagne*. The unavoidable conclusion is that *Wolff v. McDonnell, supra*, controls this case and dictates that transfer to H–House must be preceded by a hearing which complies with the procedural rights as outlined in *Wolff*.

■ Before a prisoner leaves Reidsville or any other prison for H–House, he must be given a hearing at the originating institution because a later hearing at Jackson after the transfer will obviously hamper considerably whatever defense an inmate might have. The court notes that *Wolff* does not impose a straightjacket on prison officials and makes allowance for the kind of emergencies that arise in Reidsville which necessitate immediate transfer without a hearing. But even in those rare emergencies, a prisoner must be given a hearing at Jackson shortly after his transfer.

■ Among the most disturbing aspects of H–House is how little an average prisoner is told about why he has been placed in H–House.[2] One of the many requirements of *Wolff v. McDonnell, supra*, is that the prisoner being disciplined must be given a "written statement by the fact finder as to the evidence relied on and the reasons." *Wolff v. McDonnell, supra*, 418 U.S. at 564,

---

**2.** *See e. g.* plaintiff's Exhibit # 33, a prison document which provided the prisoner with the following reason for his transfer to H–House: "Recommended by G.S.P. for entry into H–House—Approved and considered by Atlanta

Central Office." This sentence was the entirety of the "findings" arising from the prisoner's meeting with Diagnostic Center prison officials before being placed in H–House.

94 S.Ct. at. 2979, 41 L.Ed.2d at 956. This requirement means more than the rote conclusions now given to H–House inmates.

### B. *Transfer Out of H–House*

Transfer into H–House is only half of the transfer problem. Prisoners are placed there indefinitely,[3] but are told that they may get out of H–House if their conduct conforms to certain standards. The problem is that those standards are not published or written down anywhere and confusion exists among the various guards, counselors, and wardens as to what behavior on the part of the prisoner will gain him release to the less rigorous phases of H–House[4] and eventually back to the general prison population. The criteria are, as the evidence shows, largely subjective in nature[5] and arbitrarily administered. Compounding this difficulty is that often prisoners who finally are found fit for transfer according to the nebulous criteria are not transferred because other correctional institutions will not accept them. This is extremely unfair because the prisoner is further punished by H–House even though he has finished his "sentence".

 The method now used by the state to choose which prisoner shall leave H–House is the epitome of arbitrary state action forbidden by the Fourteenth Amendment. The most glaring defect is that H–House inmates are expected to comport with a certain standard of behavior, but they are not told or given a written explanation of what that standard is. Procedural due process requires, as a minimum, that notice be given of the rules. This is really nothing more than publishing a standard so that those whom the rules affect will be able to ascertain what the rules require of them. The state punishes prisoners in H–House, but conditions that punishment upon a continuing failure of the prisoner to comport with the rules of H–House. Under these circumstances, simple fairness requires that the rules be written and that they create objective criteria by which to gauge the progress of an H–House inmate.

The state claims that prisoners are now transferred out of H–House in accordance with the recommendations of a three-man panel which reviews all the prisoners in H–House every thirty (30) days and recommends whether a prisoner should be transferred. The evidence shows that the review committee does not function at all and that the transfer decision rests almost entirely with one guard. The committee is composed of the supervisor of the H–House guards, Lt. Clendenin; a counselor, Claude McCann; and the inmate service director, Stephen Phillips. One of these committeemen admitted that because of the frustrations of working in H–House he had "burned out" and no longer even went to H–House. (Phillips, Vol. IV, p. 41). The other counselor visited H–House an insufficient amount of time to acquaint himself with the individual prisoners. This left the entire decision in the hands of Lt. Clendenin. As mentioned above, many of those recommended for transfer were not transferred. Mr. Edwards, Assistant Superintendent, estimated that 75% of those recommended for transfer were not transferred. (Edwards, Vol. IX, p. 5). This happened largely because the central office in Atlanta found it difficult to place prisoners with unwilling wardens in one of Georgia's overcrowded penal institutions. (Lowe, Vol. XIII, p. 51).

---

**3.** *See* Rule 125–2–4–.03(4)(a), Department of Offender Rehabilitation, which state that administrative segregation can be for an indefinite period; prisoners are kept in H–House no less than thirty (30) days and in some cases for years.

**4.** *Compare* the testimony of W. H. Lowe, Deputy Commissioner of the Department of Offender Rehabilitation, Vol. XIII, p. 37 *with* Phillips, Vol. IX, p. 33.

**5.** *See* testimony of McCann, Vol. VI, p. 43; Phillips, Vol. IX, p. 33, 39. McCann and Phillips constitute two thirds of the panel which approves or denies transfers out of H–House. Both men freely admitted that the recommendation for transfer is based largely on subjective criteria.

■ The current review process of a three-man panel is woefully inadequate because (1) the committee does not use objective criteria in the decision to transfer, (2) the committee makes no on-going evaluation of whether the prisoner is abiding by H–House's rules, and (3) transfers, even when recommended are not carried out. All three of these inadequacies must be cured in order for H–House to be operated in a constitutional fashion. In addition to publishing the standard of behavior required of H–House inmates, the state must provide some system for periodic review of a prisoner's continued incarceration in H–House. Finally, when a prisoner is found fit for transfer as a result of one of these systematic, periodic reviews, he must then be transferred by the state out of H–House.

The court will not in this opinion set forth what the standard should be or what form the systematic review of incarceration should be. These are matters better left with the prison administrators. However, whatever plan is chosen, it must be submitted to the court for approval.

### C. *Conditions in H–House*

■ The plaintiffs assert that the method in which H–House is operated violates the Eighth Amendment's prohibition against cruel and unusual punishment. The Eighth Amendment demands that punishment must not be disproportionate to the offense and that suffering cannot be gratuitously inflicted with no purpose. The requirements of the Eighth Amendment are defined by reference to the "evolving standards of decency that mark the process of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Applying these standards to H–House, the court concludes that the method by which H–House is operated does violate the Eighth Amendment. Although individually some aspects of H–House would not be prohibited by the Eighth Amendment, the totality of the circumstances amounts to cruel and unusual punishment.

First, there can be little doubt that H–House constitutes punishment beyond the original, ordinary incarceration of inmates in the Georgia prison system. The plaintiffs' expert witness quite graphically and convincingly explained the adverse effects that the rigors of H–House bring upon its inmates. (Korn, Vol. XI, p. 22–30). Long periods of lock up in a confined space, limited contact with others, continued and unexpected surveillance and limited exercise eventually take a serious toll on the mental health of the inmates.[6] Even Warden Ricketts testified that H–House approaches the same punishment as solitary confinement. (Ricketts, Vol. IX, p. 90). Given that H–House is unquestionably extra punishment imposed upon selected prisoners in the prison system, the question becomes whether that punishment is either disproportionate or capriciously inflicted without purpose.

■ The punishment is disproportionate in several ways. First, in the case of a few of the inmates, the offense they committed was not sufficiently serious to warrant several months of confinement in near-solitary. For example, some of the inmates were transferred to H–House because they advocated prison work stops. Although openly advocating insubordination in a prison is a serious matter, it does not call for several months or years of harsh confinement in H–House. In *Adams v. Carlson*, 368 F.Supp. 1050 (E.D.Ill.1973) the court held

---

**6.** In discussing the effect of H–House on inmates, Dr. Korn stated: "The unchanging nature of the environment, nothing new to look at, the physical constriction for young people, non-activity, their level of activity, is not sufficient to sustain either mental or physical health for a long period. They come up with psychosomatic complaints. Their mental health is definitely deteriorates." (Korn, Vol. XI, p. 27). Dr. Korn interviewed six of the H–House inmates and found symptoms of the mental deterioration induced by long term isolation. (Korn, Vol. XI, p. 23, 33). There have been attempted suicides by several prisoners in H–House and at least one inmate was successful. Many inmates have purposely cut themselves, ostensibly just for an excuse to leave momentarily the oppressive confines of H–House (Edwards, Vol. IX, p. 9). All of this is vivid testament to the fact that H–House is harsh punishment.

that incarcerating prisoners in administrative segregation for sixteen (16) months because they advocated or participated in a prison work stoppage was disproportionate punishment under the Eighth Amendment. The administrative segregation unit in that case was operated very much like H–House.

■ Second, punishment in H–House is disproportionate in the sense that it has *no* proportion with respect to time. The plaintiffs' expert witness testified that perhaps the harshest aspect of H–House is the indefinite duration [7] of the confinement there. Because the passage of time is in part a function of space and activity, time truly appears to slow down for the inmate in H–House. (Korn, Vol. XI, p. 42). This slowing of time is made worse by the indefiniteness of the duration. Without hope or promise as to when the punishment will end, H–House inflicts considerable mental anguish. This anguish was described and testified to by almost everyone who had contact with H–House, including the guards, prison counselors, and prison administrators. When H–House is perceived as approaching solitary confinement in its severity, the idea of an indefinite duration of confinement shocks the conscience. This is especially true with respect to H–2 where prisoners go for several days without leaving their cell except briefly. Compounding the indefinite duration is the lack of any clear criteria by which a prisoner can work his way out of H–House. In the period from 1974 to 1976 there was no behavior modification program at all and thus an H–House inmate in that period was left adrift without standards or substantial hope of progressing out of H–House. But even now the rules are not published and the de facto rules are not evenly applied. All of this makes the punishment disproportionate.

■ Punishment in H–House is also cruel and unusual in that some of the practices there constitute gratuitous punishment inflicted without purpose. The most obvious of these practices is the retention of prisoners in H–House for months and sometimes years after they have been fully recommended for transfer out.[8] As discussed earlier, of those prisoners recommended for transfer by the review panel, over 75% were not actually transferred because of the inability or unwillingness of the Atlanta office to effect the transfer. Because of the daily harshness of H–House confinement, keeping a prisoner there several months after he has successfully qualified himself for transfer is punishment without purpose.

Another way in which the H–House routine punishes without purpose is the extreme security measures utilized against every prisoner regardless of the reason for his transfer to H–House. Relying only on one-sentence long explanations for transfer which come over a teletype machine, the prison officials at the Diagnostic Center place *all* H–House transfers first into H–2, the most restrictive portion of H–House, where they are kept a minimum of thirty (30) days.[9] In H–2 an inmate is subjected to strip searches while stun guns are trained on him and whenever an inmate is taken out of H–2 he is handcuffed and

7. Of the approximately forty-nine (49) inmates in H–House at the time of trial, twenty-three (23) had been there for longer than a year. (Clendenin, Vol. XIII, p. 28). According to the defendants an average stay in H–House is six to nine months and some prisoners have been there longer than two years. Dr. Korn testified that the indefiniteness of confinement was particularly objectionable. (Korn, Vol. XI, p. 75).

8. John C. Edwards, Assistant Superintendent of Care and Treatment at the Diagnostic Center, reported that because prisoners become frustrated when they are not transferred despite their continuing good behavior, they eventually revert to their prior bad behavior and attitudes. In consequence the recommendation is often-times withdrawn. *See* Edwards, Vol. IX, p. 6, 9; Goff, Vol. VIII, p. 7. The basic unfairness of this vicious cycle is apparent. Furthermore, the longer a prisoner stays in H–House, the more difficult it is for him to relate to others, thus decreasing the likelihood that they will remain out of H–House. (Edwards, Vol. IX, p. 20). This surely amounts to punishment without purpose.

9. McCann, Vol. VIII, p. 31. Ironically, the plaintiffs' expert testified that 30 days is the maximum period that a prisoner should stay in administrative segregation.

accompanied by two guards. All of this occurs without any determination that the prisoner is hostile or dangerous. But as Dr. Korn pointed out, treatment of this nature over a long period induces hostility in prisoners who are not broken by it. (Korn, Vol. XI, p. 10–11). Because the prisoner views the searches and handcuffing as harassment, he eventually turns on his captors (Korn, Vol. XI, p. 61–64), thereby meeting their expectation that he is dangerous. This kind of self-fulfilling prophecy is only one aspect of the extreme security utilized in H–House. The fundamental problem is that the security is harsh and is not related to a legitimate penal purpose because there is no attempt made by the prison officials to determine which H–House inmates are indeed dangerous.

█ Other features of H–House which contribute to the court's finding of cruel and unusual punishment are the catwalks and the limited exercise for the H–2 prisoners. H–2 inmates are allowed only two hours of exercise a week on a very small yard surrounded by high concrete walls. The state offered no reason whatever for this practice except limited personnel and facilities. Dr. Korn testified that exercise is extremely important in an administrative segregation unit because the prisoner is so isolated and is continually locked up. The exercise allowed in H–2 is perhaps by itself a violation of the constitution. *See Miller v. Carson,* 563 F.2d 741, (5th Cir. 1977).

The catwalk also inflicts punishment without serving any legitimate purpose. The catwalk allows guards to monitor constantly the prisoners in H–2 and because the guards follow no set routine the surveillance through the hole in the ceiling of the cell is always unexpected. The catwalk is used by the review panel and by prison counselors for nearly all communications with prisoners in H–2. Thus the fate of an H–2 inmate is determined in large part by his conversations with people talking to him from above through a metal grate. Other than through this grate the H–House inmate has very little contact with other human beings. Dr. Korn, the plaintiffs' expert was highly critical of the catwalk and testified very credibly about why its use constitutes punishment. Against this the state offered only that it reduces the number of personnel necessary to run H–House (Clendenin, Vol. XIII, p. 22). While this is a legitimate governmental interest, it does not outweigh the punishment inflicted by the catwalk and does not suffice to remove the catwalk from the category of punishment without purpose.

With respect to the operation of H–House the court has mentioned several ways in which its operation is constitutionally impermissible. However, because the court perceives the operation at H–House in its entirety as violative of the Eighth Amendment, the state must make substantial revisions in that operation. The court does not desire to interfere unduly with prison administration and therefore the state is ordered to produce its own plan for changing the operation of H–House. While the court is cognizant that H–House can serve a useful penal function, its overall operation is more restrictive than is necessary to achieve that penal function. Chief among those things which must be in some way changed or ameliorated are the following:

(1) increase the availability and duration of exercise, especially in H–2,

(2) close the catwalk,

(3) limit the use of stun guns, handcuffs and strip searches, and

(4) restrict confinement in H–House to pre-determined time length which may be lengthened only upon showing of a legitimate institutional reason.

The above items are only an outline of things which the state should change. In light of this court's ruling that the totality of H–House is in violation of the United States Constitution, the state's proposed plan must be directed at the entirety of H–House and its operation.

### D. *Mail*

The plaintiffs complain that their mail is not being handled in accordance with the

128

general constitutional guidelines set forth in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224, the definitive Supreme Court case on censoring prisoner mail. Their complaint is, first, that the prison regulations controlling the handling of mail impinge on First Amendment rights. Second, they assert that the actual practices at the Diagnostic Center violate the prohibitions of *Procunier* and *Taylor v. Sterrett,* 532 F.2d 462 (5th Cir. 1976).

Mail at the Diagnostic Center is divided into one of four categories and treated accordingly. The following description details how these categories are now handled at the Diagnostic Center:

(1) *Outgoing privileged mail:* A letter is privileged if it is written to members of Congress, the Georgia General Assembly, the Governor or Lieutenant Governor of Georgia, the President or Vice President of the United States, various state correction officials, the courts, and the inmate's attorney of record.[10] These privileged letters may be mailed already sealed by the prisoner and are not subject to censorship. However, if a privileged letter is later shown to be derogatory to the addressee, the mail privilege can be suspended. Rule 125–2–11–.07(d), State Board of Corrections Rules.

(2) *Outgoing non-privileged mail:* Any letter not addressed to a person on the privileged list falls into this category. Because it is not sealed before mailing, prison officials have the opportunity to inspect it and censor it. At the Diagnostic Center the mail of H–House inmates has occasionally been censored because it was considered by prison officials to be obscene or because prison officials thought the letter inaccurately described prison conditions. Presently most outgoing non-privileged mail is not inspected before being mailed, but prisoners are required to submit these letters unsealed.

(3) *Incoming privileged mail:* This category apparently includes letters from any person or entity on the privileged list. Mail

in this category is opened only in the presence of the inmate. It is inspected for contraband, but is not read by prison officials.

(4) *Incoming non-privileged mail:* This mail is always opened in a central mail room and inspected for contraband. It is usually not read, but prison regulations certainly allow this in order to protect prison security. Cash, money orders, or property is removed from this mail and then it is forwarded to the inmates.

The Supreme Court in *Procunier* went to great lengths to establish the proper standard for censorship and handling of prison mail; the essence of that standard is as follows:

Applying the teachings of our prior decisions to the instant context, we hold that censorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of the First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad. This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of al-

**10.** These guidelines appear in Rule 125–2–11–.02 and Rule 125–2–11–.07, State Board of Corrections Rules.

lowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more of the legitimate governmental interests identified above.

Measured by this standard, the state regulations and the actual practices at the Diagnostic Center fall short of constitutional requirements in some respects. Examining again each of the four categories the court notes the following problems:

 (1) *Outgoing non-privileged mail:* Prison officials at the Center have intercepted letters which they believed were misleading to the prisoner's family. If they felt that the letter unduly or inaccurately criticized prison conditions the letter was halted. *Procunier* directly prohibits this kind of censorship. Unless a letter contains a threat to prison order and security or is in direct violation of law, there is usually no constitutionally sufficient reason to stop it. Of course, outgoing letters can be inspected and when deemed necessary read to determine whether they contain escape plots, violations of law, or threats to the institution. But letters containing simply profane or obscene language are not the proper subject of direct censorship through either halting the letter or suspending the mailing privilege. In the words of one district court, correctional officials should not set themselves up as "the protectors of the sensibilities of the public." *Palmigiano v. Travisono,* 317 F.Supp. 776, 788, (D.R.I. 1970). But if a particular recipient of prisoner mail is offended and requests that no more letters be sent, then the state may stop letters to that recipient.[11]

Taking into consideration the above, the state must develop a plan to insure that the practices at the Diagnostic Center comply with constitutional requirements. Such a plan must provide for some method by which the persons handling the mail and

making the censorship decision are made aware of what the law requires. The evidence in the case showed that those actually making the decisions in the mail room are not cognizant of any standards (Bishop, Vol. XII, p. 21), and are given virtually no guidance.

 Finally, the plan must also provide for minimum procedural protections in the censorship process. *Procunier* expressly requires that "the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards. The interest of prisoners and their correspondents in uncensored communications by letter, grounded as it is in the First Amendment is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment." *Id.* The Court then approved the district court's plan which called for "an inmate to be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence." *Id.* These procedures are appropriate here as well and will serve as a check on mail room procedures.

 (2) *Outgoing privileged mail:* Although this mail is being handled properly, the list of privileged addressees as it appears in the state's regulation is too restricted. In *Taylor v. Sterrett,* 532 F.2d 462 (5th Cir. 1976) the Fifth Circuit held that prison mail addressed to any governmental agency or to the press fell within the "privileged" category. The list now utilized at the Diagnostic Center has omitted these two groups of addressees and must, therefore, be appropriately revised. This does not limit, however, the right of prison officials to insure that the addressee is in fact a member of the privileged group. Furthermore, if there is a reasonable suspicion that an outgoing letter contains either contraband or poses a threat to prison security,

11. Plaintiffs' exhibit 14A and 8 illustrate the kind of inappropriate censorship prohibited by *Procunier.* Both exhibits show that prison officials refused to mail letters which they considered obscene.

then the letter may be opened in the presence of the prisoner and inspected.

(3) *Incoming privileged mail:* The law requires that this mail only be opened in the presence of the prisoner. The evidence indicated that the current practices at the Diagnostic Center are in compliance with this requirement.

(4) *Incoming non-privileged mail:* The evidence showed that this mail is also being handled in accordance with constitutional standards. Prison officials can continue to open incoming mail and inspect it for contraband at a central location. It should be read only to the extent necessary to ascertain whether it poses some threat to prison security and order.

### E. *Publications*

The plaintiffs assert that their First Amendment rights have been abridged by prison officials who denied them access to certain publications. It was undisputed at trial that on occasion prisoners have been prevented from receiving certain periodicals and books. Among the various publications kept from the inmates were *Black Panther Magazine, The Communist Manifesto, Handbook of Revolutionary Warfare,* and *Guerilla Warfare and Marxism.* The defendants claimed that the censorship occurred in an effort to maintain prison order and to promote rehabilitation.

The appropriate standard for censorship of incoming periodicals comes from the recent Fifth Circuit case of *Blue v. Hogan,* 553 F.2d 960 (5th Cir. 1977). That case established that *Procunier v. Martinez,* a case discussed earlier with respect to mail procedure, also applies to publications. The salient portion of that opinion, as set out earlier, allows censorship when the government shows (1) that the censorship furthers "an important or substantial governmental interest unrelated to the suppression of expression" and (2) that the censorship is no greater a limitation on the First Amendment rights than "generally necessary to protect one or more of the legitimate governmental interests identified above." *See Blue v. Hogan,* 553 F.2d at 962. Another important feature of the *Procunier* decision is that the standard is to be applied with a minimum due process procedure by which the inmate is notified of the censorship, given a reason for it, and allowed to appeal the decision to the person who did not make the original censorship decision.

■ The Georgia prison regulations in question meet these constitutional standards.[12] The evidence in the record of this case, however, shows that at least on some occasions, the practice of censorship differs from the rules. Censorship has occurred without sufficient effort to determine whether the censored publication in reality poses some kind of a remote threat to the security and order of the penal institution. Although *Procunier* does not impose on the prison officials the necessity of showing a clear and present danger to prison order, there nonetheless must be some substantial relation between the asserted governmental interest (in this case, prison security) and the censorship. *Blue v. Hogan, supra.*

An example of the kind of prohibited censorship occurred when one inmate attempted to procure six books which related to communist doctrine. The warden halted the procurement without giving a reason for the censorship. At trial the warden offered only that he believed the books were inflammatory and that he didn't like their provocative titles. However, no attempt was made to show the court how this act of censorship bore a substantial relation to a legitimate, penal goal. In fact, in prior prison litigation, a district court has specifically held that one of the six books cannot be censored because it does not pose a threat to prison security. *Laaman v. Hancock,* 351 F.Supp. 1265 (D.N.H.1972). The evidence showed that censorship occurred in the instant case without an effort to deter-

---

12. Rule 125–2–11–.04(2)(a), State Board of Corrections Rules, states: "Inmates may not receive books, periodicals, or newspapers, the contents of which could clearly and reasonably be expected to present a threat to institutional security and discipline." This comports generally with the dictates of *Blue v. Hogan,* 553 F.2d 960 (5th Cir. 1977).

mine whether the content and nature of the publication posed a threat to prison order. It also occurred without giving some justification for the censorship and without a procedure for contesting the censorship.

In order to meet the *Procunier* standards, the prison officials must follow scrupulously their own regulations and must be prepared in each instance of censorship to give express, nonconclusory reasons as to why a publication cannot be received. With respect to periodicals, in which the content varies from issue to issue, only those issues which are offensive can be censored. This is what *Procunier* means by its holding that the limitation on First Amendment rights can be no greater than generally necessary to protect the legitimate governmental interest of prison security. And, as mentioned earlier, the prisoner must be given a chance after notification of censorship to appeal the decision to a person who did not make the original decision to censor.

The court does not believe it is necessary to rule on each of the books and periodicals to which censorship has earlier occurred. But the court will state that the standard is not what prison officials consider personally offensive or inflammatory. Rather, the standard is what an objective person could reasonably believe to be directly detrimental to security, order, or rehabilitation. Unless it can be shown that the censorship is generally necessary to protect one of these three things, then it must not occur. *Procunier v. Martinez, supra; Blue v. Hogan, supra.* Here again, the state must provide the court with a plan to assure the appropriate *application* of *Blue, Procunier,* and Georgia's prison regulations.

### F. *Visitation*

Although the parties have treated this aspect of the case as a separate issue, it is actually an integral part of the general circumstances surrounding the operation of H–House. Visitation for H–House inmates is limited to weekday, no-contact visits with only family members. Although there is no constitutional right to visitation in and of

itself, *Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977), the visitation procedures can be the subject of equitable relief once it is found that the totality of the circumstances in a prison violate the Eighth Amendment. *See Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977). In this respect, the extremely limited visitation allowed H–House inmates contributes to the court's earlier finding of a violation of the Eighth Amendment. Importantly, in justifying the week-day only, no-contact visitation, the prison officials offered as a reason for these practices only that money and space limitations prevented more extensive visitation (Vol. III, p. 13). In lieu of more compelling reasons for the limitation, the court considers the H–House visitation rules as simply too restrictive. The Fifth Circuit has recently spoken to the question of visitation in *Newman v. Alabama* :

> Under our decision in *McCray v. Sullivan,* (509 F.2d 1332, 5 Cir., 1975), we feel that visitation regulations should be left to the prison authorities, wisely adapted to individual circumstances if their sound discretion should so dictate, or included in general rules which will allow prisoners reasonable visitation.

The court's primary concern with H–House visitation policy is that it has not been "wisely adapted to individual circumstances." All prisoners have been denied contact visits apparently on the assumption that any prisoner in H–House is violent, even toward his own family. Some prisoners have not been visited because of the hardship that weekday visitation imposes on their working families. Counterbalancing this is the state's failure to justify the current visitation practices as anything more than a convenience to those operating the prison.

In light of the above the state must, as a part of its general plan to alter H–House, submit rules which will allow "reasonable visitation", "adapted to individual circumstances."

### G. *Property*

The plaintiffs' claim that their property has been unlawfully confiscated or de-

stroyed because the prison officials at the Diagnostic Center have purposely failed to adopt procedures designed to protect inmate property. The property problem arises because 90% of H–House inmates are transferred from the Georgia State Prison at Reidsville where they are allowed to keep a considerable amount of personal property. Prisoners are allowed very little personal property in H–House, so they must divest themselves of possessions upon arriving at the Diagnostic Center.

■ Of course, prison officials cannot permanently take property from prisoners once they have been allowed to have property in prison. *Diamond v. Thompson*, 523 F.2d 1201 (5th Cir. 1975); *Demps v. Wainwright*, 522 F.2d 192 (5th Cir. 1975). But controlling how much property prisoners can have with them in the cell is clearly within the discretion of prison officials. The evidence in this case shows that the procedures at the Diagnostic Center adequately protect prisoner property. Upon arriving at the Diagnostic Center the prisoner's property is immediately processed. The property which can no longer be kept in H–House is either mailed to the prisoner's home, donated to charity, or given to the prisoner's family when they visit. If none of these alternatives are available and the property is of value, it is stored. Inventories are kept as well. Under these circumstances, the procedures at the Diagnostic Center are not in violation of the constitution. The only caveat is that prisoners upon transfer to H–House should be given an opportunity to either dispose of their property at the prison from which they are transferred or be allowed to take their property with them to the Diagnostic Center for disposition there. A system in which the prisoner is transferred before he can either gather or dispose of his property is too open for abuse. It appears to the court that current practices at Georgia State Prison allow a prisoner to gather his property and take it to the Diagnostic Center with him. In conclusion, from examining the record of this case and the testimony, the court concludes the plaintiffs have not proved constitutional deprivations with respect to the property issue.

### III.

#### Class Certification

In the plaintiffs' amended complaint of July 19, 1976, they moved the court to certify that the case could proceed as a class action defined as all inmates of the Georgia prison system subject to transfer to H–House and all inmates incarcerated in H–House.

■ The court finds that the prerequisites for a class action found in Rule 23(a), Federal Rules of Civil Procedure have been met by the plaintiffs. The class is so numerous that joinder is obviously impracticable and there are common questions of law and fact. The named plaintiffs are now or have been inmates of H–House and thus appropriately represent the class through their court-appointed attorneys. Accordingly, with respect to the six (6) issues litigated in this order the action is certified as a class action for purposes of injunctive and declaratory relief only in accordance with Rule 23(b)(2). The class is defined as all inmates of the Georgia prison system subject to transfer to H–House and all inmates incarcerated in H–House (Georgia Diagnostic and Classification Center). It is not necessary to notify all members of the class because the class has been certified pursuant to Rule 23(b)(2). *Childs v. U. S. Board of Parole*, 167 U.S.App.D.C. 268, 511 F.2d 1270 (1974).

The individual complainants also sought compensation for the alleged taking of inmate property. The court has ruled in this order against these plaintiffs on that issue and damages are therefore not recoverable. The above class certification is only for purposes of injunctive and declaratory relief and does not relate to damages or compensation.

### IV.

#### Conclusion

Several aspects of H–House have been considered in this opinion and found to be in

violation of the Eighth and Fourteenth Amendments. Unquestionably, changes must be made in the way H–House is operated so that it can serve its appropriate penal function without offending constitutional requirements. The court has purposely avoided commanding specific equitable relief because "federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the states." *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Instead, the court has, with respect to each of the issues, set forth general guidelines which the state prison officials must follow in devising their own plan to correct the shortcomings of H–House. Such an approach will allow the state prison officials who administer the prison system to fashion changes which do not impinge on their demonstrable and important interests and concerns. The prepared plan is to be submitted to the court within thirty (30) days of the receipt of this order and should be as detailed as possible.

Within thirty (30) days following receipt of defendants' proposed plan, the plaintiffs may comment on and/or submit alternate or additional plans to the court. Defendants, within ten (10) days after receipt of plaintiffs' proposals, may comment thereon.

The court will then proceed to fashion a plan.

SO ORDERED, this 12th day of January, 1978.

In these actions one of the issues before the court is whether the prisoners at the Georgia Diagnostic and Classification Center have a law library which is sufficient to provide the prisoners with adequate access to the courts. While this case was under consideration the Supreme Court decided *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), which requires the state to provide prisoners with legal assistance, either in the form of a law library or through attorneys. The defendants have agreed to expand this aspect of the instant case beyond the Diagnostic Center to include all prisoners in the State of Georgia who are being held by the Georgia

Department of Offender Rehabilitation. The state has submitted a proposed plan to comply with *Bounds* throughout the Georgia prison system. The plaintiffs have had an opportunity to comment on and supplement this plan.

The state's proposal includes four complete prison libraries; one at the Georgia Diagnostic & Classification Center, one at the Georgia State Prison, one at the Georgia Industrial Institute, and the fourth at the complex of institutions at Milledgeville which are under the jurisdiction of the Department of Offender Rehabilitation. In addition, attorneys who are employed by the Prisoner Legal Counseling Project, a state funded entity affiliated with the University of Georgia School of Law, will visit every institution in the state where prisoners are held by the Department of Offender Rehabilitation. The visits, according to the state's plan, will be no less frequent than every thirty (30) days at each institution.

The court finds that the state's proposed plan is currently adequate to provide prisoners with adequate access to the courts. The plan also includes quarterly reports to the court by the Prisoner Legal Counseling Project, beginning April 1, 1978. These reports shall inform the court about the frequency of visits by the Prisoner Legal Counseling lawyers to the various institutions and shall provide the court with information about the adequacy of the current plan.

With the suggestions of both the defendants and plaintiffs the court has concluded that the following materials shall be included in each of the four proposed libraries:

### FEDERAL MATERIALS

1. West's Supreme Court Reports, or Lawyer's Edition, 1960 and forward
2. Federal Second Reporter—1960 and forward
3. Federal Supplement Reports—1960 and forward
4. United States Code Annotated—West Publishing Company:
 (a) Index volumes

FEDERAL MATERIALS—Cont'd

4. United States Code Annotated—West Publishing Company —Cont'd

(b) Constitution of the United States volumes
(c) Title 18 volumes
(d) Title 28 volumes
(e) Title 42 volumes

5. Federal Practice Digest—Second series

* 6. Paper back edition—Federal Rules of Civil Procedure, Evidence, Appellate Procedure and Title 28—West Publishing Company

* 7. Paper back edition—Federal Rules of Criminal Procedure, Evidence, Appellate Procedure and Title 18—West Publishing Company

8. Shepard's United States Citations

9. Shepard's Federal Second and Federal Supplement Citations

GEORGIA MATERIALS

1. Georgia Code Annotated—Harrison Publishing Company

(a) Index volumes
(b) Title 1, United States Constitution
(c) Title 2, Georgia Constitution
(d) Title 6—Appeal and Error
(e) Title 26—Criminal Code
(f) Title 27—Criminal Procedure
(g) Title 38—Evidence
(h) Title 50—Habeas Corpus
(i) Title 77—Penal Institutions
(j) Title 81A—Civil Procedure

2. Georgia Digest—West Publishing Company

3. Southeastern Reporter, Second series—Georgia cases—1900 and forward; Georgia Appeals, 1907 and forward

For years preceding the publishing of the aforesaid, either Southeastern Reporter or the official reports of decisions of the Supreme Court of Georgia and the Court of Appeals of Georgia.

4. Shepard's Georgia citations

MISCELLANEOUS PUBLICATIONS

1. Corpus Juris Secundum—

(a) Habeas Corpus volumes
(b) Appeal and Error volumes
(c) Constitutional law volumes

2. Black's Law Dictionary

3. Cohen, *Legal Research in a Nutshell*

4. Criminal Law Reporter

5. Israel, *Criminal Procedure in a Nutshell*

6. Molnar, *Georgia Criminal Law*

* 7. Sokol, *Federal Habeas Corpus*

8. Prison Law Reporter

9. Wright, *Federal Courts*

10. Davis and Schulman, *Georgia Practice and Procedure*

* 11. Potts, *Prisoners Self Help Litigation Manual*

* 12. ACLU Handbook—*The Rights of Prisoners*

13. Green, *The Georgia Law of Evidence*

14. Morgan Thomas' Notes

* Each of the books by which there is an asterisk shall be furnished in at least three (3) copies. Each book is to be the latest edition and to include pocket parts, supplements and replacements.

The court shall retain jurisdiction of this matter and expects the plan as currently formulated to be implemented within six (6) months. Defendants shall provide the court with a full report when its plan has been finally implemented.

The court will modify this order if experience under the State's prepared plan shows that a change is necessary.

SO ORDERED, this the 18th day of January, 1978.