**Jack ABBOTT, et al., Appellants,**

v.

**Edwin MEESE, III, Attorney General of the United States, et al.***

No. 84–5718.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 23, 1986.

Decided July 28, 1987.

As Amended July 28, 1987.

---

\* The complaint, filed in 1973, names as its first defendant Elliot Richardson, individually and as Attorney General of the United States. Insofar as he was sued in his official capacity, his successors in office from time to time have been automatically substituted by operation of FEDER-AL RULE OF CIVIL PROCEDURE 25(d)(1), including the present Attorney General, the Honorable Edwin Meese, III. Other defendants are the Director of the Federal Bureau of Prisons, and a number of others, individually and as wardens of federal prison facilities.

Steven Ney, with whom Edward I. Koren and Alvin J. Bronstein, Washington, D.C., were on brief, for appellants.

Richard A. Stanley, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., were on brief, for appellees.

Before EDWARDS and RUTH BADER GINSBURG, Circuit Judges, and FAIRCHILD, Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.**

Opinion for the Court filed by Senior Circuit Judge FAIRCHILD.

FAIRCHILD, Senior Circuit Judge.

This action involved, among other things, regulation of correspondence between inmates of different prisons, and rejection of publications directed to inmates. Named plaintiffs were prisoners and former prisoners suing on behalf of themselves and all other prisoners in federal institutions. On June 7, 1974, the district court ordered that the action be maintained as a class action, except for determining the question of damages, and that the class consist of all current and future prisoners. On September 1, 1978, on plaintiff's motion, the district judge ordered the addition, as plaintiffs, of the Prisoners' Union, Weekly Guardian Associates, and the Revolutionary Socialist League, publishers of publications which had been rejected at federal prisons.

On September 13, 1984, after trial, the district court filed a decision, and ordered defendants permanently enjoined from applying certain regulations, but granted judgment for defendants in all other respects. Plaintiffs and defendants appealed from the portions of the judgment adverse to them. Defendants' appeal, however, was later dismissed on their motion. Individual damage claims had been "severed" before trial. Assuming that the existence of unresolved damage claims deprives the judgment of finality, we have jurisdiction

---

** Sitting by designation pursuant to 28 U.S.C. § 294(d).

under 28 U.S.C. § 1292(a)(1) since the order refused injunctions sought by plaintiffs.

In arguing the appeal, plaintiffs have not challenged all the portions of the judgment adverse to them. The issues argued relate to a general prohibition, with certain exceptions, of inmate-to-inmate correspondence, and censorship of publications directed to inmates.

## I. Prohibition on Inmate-to-Inmate Correspondence

The regulation relating to correspondence between inmates, 28 C.F.R. § 540.17 (1986), reads as follows:

An inmate may be permitted to correspond with an inmate confined in any other penal or correctional institution, providing the other inmate is either a member of the immediate family, or is a party or a witness in a legal action in which both inmates are involved. The Warden may approve such correspondence in other exceptional circumstances, with particular regard to the security level of the institution, the nature of the relationship between the two inmates, and whether the inmate has other regular correspondence. The following additional limitations apply:

(a) Such correspondence at institutions of all security levels may always be inspected and read by staff at the sending and receiving institutions (it may not be sealed by the inmate);

(b) The Wardens of both institutions must approve of the correspondence.

Although the language is permissive in form, the record indicates that the regulation amounts to a prohibition except for correspondence between family members or those involved in a legal action.

The district court upheld the regulation, writing as follows:

The plaintiffs contend that the general ban on prisoner-to-prisoner correspondence destroys prisoner relationships, thus working a hardship on inmates and prohibiting a potentially rehabilitative activity. As on the publications issues, the plaintiffs point to state systems which

have liberal policies but find no adverse results.

They argue that inmate "grapevines" are usually strong enough to relay information between prisons without the benefit of mail privileges, rendering the ban on written communication useless and therefore unduly restrictive.

The defendants respond that prisoner-to-prisoner mail could be used for communication between members of prison gangs: in particular it could be used to arrange assaults on inmates who are transferred under the Bureau's protective custody program. Testimony on the conduct of prison gangs indicated that this is not a remote possibility. There was evidence, too, that prisoners have succeeded in sending letters to one another in order to carry on drug transactions and formulate escape plans. The plaintiffs suggest that the risk of such problems could be handled by monitoring correspondence; but the defendants reply that they could not hope to monitor a sufficient number of letters, and in any event, prisoners could easily write in private jargon that prison authorities would not understand. Thus no less restrictive policy than a general ban on inter-inmate correspondence is in the interest of security. The court sustains this position. Again, as in the case of publications, the Bureau is not obliged to take risks other systems accept, nor is it required to forego controlling one means of communication where it cannot all means.

The Supreme Court recently upheld a very similar prohibition in *Turner v. Safley*, — U.S. —, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). *Turner* clearly controls this point, with one possible exception.

The regulation considered in *Turner* permits correspondence "concerning legal matters," but the regulation before us is more restrictive, permitting an inmate to correspond with another inmate who "is a party or a witness in a legal action in which both inmates are involved."

Plaintiffs challenge the regulation on the ground that it prevents inmates from seek-

ing and obtaining legal assistance from other inmates. This argument rests upon the inmates' "constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977).

In *Johnson v. Avery*, 393 U.S. 483, 490, 89 S.Ct. 747, 751, 21 L.Ed.2d 718 (1969), the Supreme Court held that "unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce a regulation ... barring inmates from furnishing such assistance to other prisoners." *See Rudolph v. Locke*, 594 F.2d 1076, 1078 (5th Cir.1979). *Johnson* was extended to assistance in civil rights actions in *Wolff v. McDonnell*, 418 U.S. 539, 577–80, 94 S.Ct. 2963, 2985–86, 41 L.Ed.2d 935 (1974). 430 U.S. at 828, 97 S.Ct. at 1498. As suggested by the *Johnson* language, there is no absolute right to the assistance of another inmate if a reasonable alternative is provided.

It has been held that where an adequate method of access is provided, an inmate may not insist on the right to the assistance of a particular inmate. *Gometz v. Henman*, 807 F.2d 113, 116 (7th Cir.1986); *Storseth v. Spellman*, 654 F.2d 1349, 1353 (9th Cir.1981).

The Bureau has several regulations pertaining to "Inmate Legal Activities" 28 C.F.R. § 543.10–.16. Defendants point out a provision requiring each Warden to establish an inmate law library and procedures for access to legal reference materials and to legal counsel, and for the preparation of legal documents. Section 543.15 governs legal aid programs which are funded or approved by the Bureau. Section 543.11(f) provides that unless the institution has an active, ongoing legal aid program, the Warden shall allow an inmate the assistance of another inmate during leisure time.

If, in fact, the Bureau failed to provide resources and assistance sufficient to fulfill an inmate's right to meaningful access to the courts without the assistance of inmates in other institutions by correspondence, an amendment to the prohibition of correspondence would be required. The

record, however, does not establish the lack of a reasonable alternative.

## II. REJECTION OF PUBLICATIONS

The Bureau of Prisons has issued regulations delegating to each warden authority to reject a publication to which an inmate has subscribed or which has been otherwise sent to him. Generally the warden may reject a publication only if it is determined "detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." 28 C.F.R. § 540.71(b) (1986). The regulation also sets forth a non-exhaustive list of criteria, and a publication which meets one of them "may" be rejected. Rejection by the warden is subject to appeal within the Bureau of Prisons. We set forth in an Appendix the governing regulations, 28 C.F.R. § 540.70 and § 540.71(b), (c), (d), and (e), as well as a portion of a Bureau Program Statement No. 5266.5 which contains updated additional instructions dealing with sexually explicit material.

Plaintiffs challenge on First Amendment grounds parts of § 540.71(b) and the Program Statement facially and as applied. They seek a specific determination on 46 rejected publications. "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). The freedom of the inmates to receive publications and to read them is at stake. "It is now well established that the Constitution protects the right to receive information and ideas. 'This freedom [of speech and press] ... necessarily protects the right to receive....'" *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969) (quoting *Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943)). More significantly, however, in this area of the law, the regulation causes a restriction on the First Amendment rights of the publishers of the material, including those publishers who are plaintiffs. *See Procunier v. Mar-*

*tinez*, 416 U.S. 396, 409, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974), and *Turner*, —— U.S. at ——, 107 S.Ct. at 2259.

■ The Supreme Court has not articulated a standard of review to be applied to censorship of content in the exact context presented here. *Martinez*, 416 U.S. at 413, 94 S.Ct. at 1811 comes close. *Martinez* dealt with ideas expressed in correspondence (where here the expressions come to the inmate in published material). *Martinez* dealt with inter-personal communication between inmates and non-inmates, and emphasized protection of the rights of the non-inmate correspondent in two-way communication (where here the communication is in one direction, and not between individuals; the right of the non-inmate being to publish and the right of the inmate being to receive and read). Both *Martinez* and the case at bar deal with some aspect of the First Amendment rights of a non-inmate, and both deal with the expression of ideas on paper and not with conduct qua expression. We conclude that the *Martinez* standards are applicable here.[1]

Stating criteria for justifying censorship of prisoner mail, the *Martinez* Court said,

First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of

security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.

416 U.S. at 413, 94 S.Ct. at 1811.

■ Critical to both the *Martinez* holding and our case is the question of the required degree of probability that an expression of an idea will cause conduct destructive of security or order. (Little in our case involves a claimed impairment of rehabilitation.) Turning to that matter, the *Martinez* Court went on:

This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more of the legitimate governmental interests identified above.

416 U.S. at 414, 94 S.Ct. at 1811. We think it follows that a regulation authorizing censorship must reflect, and in applying the regulation the prison administrator must carry, the burden of showing that the censorship is "generally necessary."[2]

---

1. A number of courts have so held: *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1030 (2d Cir.1985); *Aikens v. Jenkins*, 534 F.2d 751, 755 (7th Cir. 1976); *Carpenter v. South Dakota*, 536 F.2d 759 (8th Cir.1976); *Cofone v. Manson*, 409 F.Supp. 1033, 1039 (D.Conn.1976); *Jackson v. Ward*, 458 F.Supp. 546, 558 (W.D.N.Y.1978); *McCleary v. Kelly*, 376 F.Supp. 1186, 1189 (M.D.Pa.1974); *Hopkins v. Collins*, 411 F.Supp. 831, 833 (D.Md. 1975), *reversed in part on other grounds*, 548 F.2d 503 (4th Cir.1977); *Hardwick v. Ault*, 447 F.Supp. 116, 131 (M.D.Ga.1978). *See*, however, a suggestion that the standards for censorship of publications may be lower than *Martinez*: *Blue v. Hogan*, 553 F.2d 960 (5th Cir.1977); *Guajardo*

*v. Estelle*, 580 F.2d 748, 760 (5th Cir.1978); *cf. Vodicka v. Phelps*, 624 F.2d 569 (5th Cir.1980).

Although in *Turner*, the Court rejected application of the stricter *Martinez* standard to regulation of correspondence between inmates, we conclude that it did not overrule or restrict *Martinez* as applied to situations where the First Amendment rights of non-inmates are involved.

2. *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1033 (2d Cir.1985); *Morgan v. LaVallee*, 526 F.2d 221, 224 (2d Cir.1975); *Guajardo v. Estelle*, 580 F.2d 748, 760 n. 7 (5th Cir.1978); *Vodicka v. Phelps*, 624 F.2d 569, 574 (5th Cir.1980); *Aikens v. Jenkins*, 534 F.2d 751, 755 (7th Cir.1976); *Jackson v. Ward*, 458 F.Supp. 546, 557 (W.D.N.

The district court, however, concluded that the *Martinez* standards are not applicable to censorship of publications, and placed the burden of proof on plaintiffs. Citing *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), and *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the court said,

> Those cases require the Bureau to articulate a rational relationship between its regulations (and practices) and legitimate penological objectives such as internal security. Once the Bureau meets that requirement, the plaintiffs must show by "substantial evidence" that the defendants have "exaggerated their response" to the problems the regulations address.

The government argues in support of the district court's conclusions. We think these cases dealt with action and conduct occurring or threatened within the prisons and we do not agree that they state the standard for permissible censorship of information and ideas expressed in publications.

The regulation upheld in *Pell v. Procunier* forbade press and other media interviews with specific individual inmates. The Court said, in part,

> Although they would not permit prison officials to prohibit all expression or communication by prison inmates, security considerations are sufficiently paramount in the administration of the prison to justify the imposition of some restrictions on the entry of outsiders into the prison for face-to-face contact with inmates.
>
> *    *    *    *    *    *
>
> Such considerations [permitting rehabilitative visitation while keeping visitations at a level which will not compromise security] are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their re-

sponse to these considerations, courts should ordinarily defer to their expert judgment in such matters.

417 U.S. at 827, 94 S.Ct. at 2806.

In distinguishing *Martinez,* the Court stated as follows:

> In *Procunier v. Martinez, supra,* we could find no legitimate governmental interest to justify the substantial restrictions that had there been imposed on written communications by inmates. When, however, the question involves the entry of people into the prisons for face-to-face communication with inmates, it is obvious that institutional considerations, such as security and related administrative problems, as well as the accepted and legitimate policy objectives of the corrections system itself, require that some limitation be placed on such visitations. So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, we believe that, in drawing such lines, "prison officials must be accorded latitude."

417 U.S. at 826, 94 S.Ct. at 2806 (citation omitted).

In *Jones v. North Carolina Prisoners' Union,* the Court upheld actions of prison officials prohibiting inmates from soliciting other inmates to join the Prisoners' Union, barring all meetings of the Union, and refusing to deliver packets of Union publications mailed in bulk to several inmates for redistribution among others. 433 U.S. at 121, 97 S.Ct. at 2535. The prison officials held the view that a prisoners' union would be detrimental to order and security. "It is enough to say they have not been conclusively shown to be wrong in this view." 433 U.S. at 132, 97 S.Ct. at 2541.

> If the appellants' views as to the possible detrimental effects of the organizational activities of the Union are reasonable, as we conclude they are, then the regulations are drafted no more broadly than they need be to meet the perceived threat—which stems directly from group

Y.1978); *Hardwick v. Ault,* 447 F.Supp. 116, 131 (M.D.Ga.1978); *Mawby v. Ambroyer,* 568

F.Supp. 245, 251 (E.D.Mich.1983). *Cf. Carpenter v. South Dakota,* 536 F.2d 759 (8th Cir.1976).

meetings and group organizational activities of the Union. *Cf. Procunier v. Martinez*, 416 U.S. at 412–16, 94 S.Ct. at 1810–13. When weighed against the First Amendment rights asserted, these institutional reasons are sufficiently weighty to prevail.

433 U.S. at 133, 97 S.Ct. at 2541.

Again, as in *Pell v. Procunier*, conduct within the prison, rather than the content of expression, was the critical issue.

> Nor does the prohibition on inmate-to-inmate solicitation of membership trench untowardly on the inmates' First Amendment speech rights. Solicitation of membership itself involves a good deal more than simple expression of individual views as to the advantages or disadvantages of a union or its views; it is an invitation to collectively engage in a legitimately prohibited activity. If the prison officials are otherwise entitled to control organized activity within the prison walls, the prohibition on solicitation for such activity is not then made impermissible on account of First Amendment considerations, for such a prohibition is then not only reasonable but necessary.

433 U.S. at 131–32, 97 S.Ct. at 2540–41 (citation omitted).

In *Bell v. Wolfish*, the Court decided that a prohibition against receipt of hardback books unless mailed directly from publishers, book clubs, or bookstores does not violate the First Amendment rights of MCC inmates. That limited restriction is a rational response by prison officials to an obvious security problem. It hardly needs to be emphasized that hardback books are especially serviceable for smuggling contraband into an institution; money, drugs, and weapons easily may be secreted in the bindings. They also are difficult to search effectively. There is simply no evidence in the record to indicate that MCC officials have exaggerated their response to this security problem and to the administrative difficulties posed by the necessity of carefully inspecting each book mailed from unidentified sources. Therefore, the considered judgment of these experts must control

in the absence of prohibitions far more sweeping than those involved here.

441 U.S. at 550–51, 99 S.Ct. at 1880 (citations omitted).

As the Court pointed out, this rule operated without regard to the content of the expression. *Id.* at 551, 99 S.Ct. at 1880.

In *Turner v. Safley*, —— U.S. ——, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Court upheld a prison regulation prohibiting correspondence between inmates of different institutions unless they are family members, and struck down a regulation greatly restricting marriage of an inmate. The lower courts had applied *Martinez* to the prohibition on inmate-to-inmate correspondence. The Supreme Court found that reliance improper, saying of *Martinez*,

> [O]ur holding therefore turned on the fact that the challenged regulation caused a "consequential restriction on the First and Fourteenth Amendment rights of those who are *not* prisoners." *Id.*, 416 U.S. at 409, 94 S.Ct. at 1809. (emphasis added). We expressly reserved the question of the proper standard of review to apply in cases "involving questions of 'prisoners' rights.'" *Ibid.*

*Id.* at ——, 107 S.Ct. at 2260.

After summarizing the decisions which came after *Martinez*, the Court said:

> If *Pell, Jones* and *Bell* have not already resolved the question posed in *Martinez*, we resolve it now: when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.

*Id.* at ——, 107 S.Ct. at 2261. The Court concluded that the prohibition of correspondence between inmates fulfilled the standard, but the rule on marriage did not.

We find no holding that the tests for prison censorship of a publication on the basis of content, having an impact on the rights of the publisher, are different from those stated in *Martinez*.

If a regulation were to authorize the Warden to reject a portion of a publication only if he found that the material would "encourage" violence, or some other speci-

fied type of conduct breaching security or order or in some particular way impairing rehabilitation, we think that regulation could survive the minimum *Martinez* tests. Language in *Martinez* suggests that encouragement would be a sufficient causal nexus between expression and proscripted conduct so that the expression could be rejected.[3] A Warden's finding to that effect would be entitled, on review, to deference by reason of his expertise. *Martinez,* 416 U.S. at 405, 414, 94 S.Ct. at 1807, 1811; *Pell,* 417 U.S. at 827, 94 S.Ct. at 2806; *Jones,* 433 U.S. at 126, 97 S.Ct. at 2538; *Bell,* 441 U.S. at 551, 99 S.Ct. at 1880; and *Turner,* —— U.S. at ——, 107 S.Ct. at 2260. Going beyond minimum constitutional requirements, it would follow that the more pointedly the regulation spelled out a requirement of a specific finding, including reasons therefor, that particular rejected material would very probably produce a specifically described breach of security or order or an impairment of rehabilitation in some particular way, the more likely each rejection would be sustained when challenged in court.

The regulation before us, however, fails to satisfy the minimum *Martinez* test. Although the introductory paragraph of (b) appears at first to limit the Warden's authority to rejecting material "determined detrimental to the security, good order, or discipline of the institution," it goes on to provide: "or if it might facilitate criminal activity." "[M]ight facilitate" permits a far looser causal nexus between expression and proscribed conduct than "encourages." Moreover, the term "detrimental" is susceptible of different meanings and must be interpreted in the light of the fact that the Regulation goes on expressly to authorize rejection of a publication which meets any one of a list of seven criteria, the list being non-exhaustive.

Plaintiffs do not challenge criterion (1) ("depicts or describes procedures for the construction or use of weapons, ammunition, bombs, or incendiary devices"); a portion of (2) ("contains blueprints, drawings or similar description of Bureau of Prisons institutions"); (3) ("depicts or describes procedures for the brewing of alcoholic beverages, or the manufacture of drugs"); or (4) ("written in code")

The balance of criterion (2) authorizes rejection of a publication which "depicts, encourages, or describes methods of escape from correctional facilities." Although "encourages" would suffice as a causal nexus between expression and proscribed conduct, "depicts" and "describes" do not.

Criterion (5) is deficient in several respects. It authorizes rejection of a publication which "depicts, describes or encourages activities which may lead to the use of physical violence or group disruption." Again, "depicts" and "describes" fall short. "Activities" are described as those which "may lead" to physical violence or group disruption. "Group disruption" could mean types of events which are not a breach of security or order or an impairment of rehabilitation.

Criterion (6) authorizes rejection of a publication which "encourages or instructs in the commission of criminal activity." As to that which "instructs" there is no requirement of a finding of a probability that the publication will produce a breach of security or order or an impairment of rehabilitation.

Criterion (7) relating to sexually explicit material should doubtless be read as interpreted or qualified by Bureau Program Statement No. 5266.5. (*See* Appendix.) Paragraph (a) of the Statement enumerates specific types of sexually explicit material, but it requires no finding of causal nexus between possession of the listed material and breaches of security or order or impairment of rehabilitation.

■ The Bureau follows the practice of rejecting and returning an entire publication once a portion of it is deemed objectionable. Even assuming that the portion is appropriately rejected under *Martinez* standards, rejection of the balance is not

---

3. Whether "encourage," standing alone, sufficiently connotes propelling action or conduct in other First Amendment contexts may be questioned. *See United States v. Dellinger,* 472 F.2d 340, 361 (7th Cir.1972).

"generally necessary" to protect the legitimate governmental interest involved in the portion properly rejected. Defendant Carlson admitted that there is really no reason for not deleting the offending material and turning over the balance to the inmate, although there was testimony by some that in their judgment deleting specific portions would generate more discontent than total rejection. The district court found that these fears were reasonably founded. We conclude the finding conflicts with the holding of *Martinez* that prison administrators have the burden of showing that a restrictive practice is "generally necessary." 416 U.S. at 414, 94 S.Ct. at 1812. Thus, this practice of rejecting an entire publication where a part is objectionable is inconsistent with the First Amendment.

At the time of rejection of a publication, the Warden writes to the inmate, informing him of the rejection and the reasons for it. 28 U.S.C. § 540.71(d) (1986). The district court did not address particular reasons for rejection, but generally concluded "that the notices normally make the general nature of the warden's objections clear," and that the

explanations are not as articulate as they might be, but neither are they simply restatements of the general standard for excluding publications. Chiefly they lack reference to the circumstances in the prison that support the Warden's decision. At first this is a striking omission, since the Warden's awareness of conditions in his particular facility is the theoretical basis for his wide discretion to reject publications. Defense witnesses testified, however, that it is unwise to inform inmates of conditions that cause security concerns in the Warden. Such a policy could expose weaknesses in prison security to exploitation by inmates. This reasoning the court finds, supports the defendant's practice.

We have not examined every statement of reasons for rejection, but there are some, at least, which cannot be deemed

findings of an adequate causal nexus between a rejected publication and a breach of security or order or interference with rehabilitation. Examples are:

(1) The publication is the March 21, 1977, issue of *The Call.* The relevant small portion of the issue is an article entitled "Hell holes at Marion Prison—Prisoners expose 'Control Unit'." The story is highly critical of described practices, but is narrative in form. While asserting that "inmates have staged strikes and facts and have continued to struggle against their oppression," it contains no exhortation. The Atlanta warden's comment asserts that the issue states that prisoners should revolt against the use of control units and further indicates that inhumane treatment is being administered by racist guards, within the Federal Prison System. The inflammatory material contained in this issue of *'The Call'* can present problems in a facility such as ours and is considered not to be in the best interest of discipline, good order and security of the institution.

(2) The same issue was rejected at Marion with the comment,

The ... Committee believes that this publication is used in part to glorify problem inmates and prison unions which could cause problems to inmates and staff in the security and orderly running of this institution. This publication also [propagates] an adversary attitude by inmates toward staff.

(3) One article in *Labyrinth,* April 1977, was entitled "Medical Murder." It reported two deaths in federal prisons and two in a state prison. Each story related inadequate or improper medical treatment, and concluded that the prisoners, although sentenced to terms, were "in fact sentenced to death and *were murdered by neglect.*" [4] (Emphasis in the original.) The letter rejecting this issue of *Labyrinth* explained:

The basis for our decision is that this type of philosophy could guide inmates in this institution into situations which

4. The complaint in an action brought on account of one of these deaths was considered in *Green v. Carlson,* 581 F.2d 669 (7th Cir.1978),

*aff'd, Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).

could cause themselves and other inmates problems with the Medical staff.

(4) The September 15–October 14, 1977, issue of *Torch* contained a letter ostensibly from an inmate in a state penitentiary. The writer described hard conditions of prison work and life. It was printed under the title "Slave Labor at Angola Penitentiary." The issue was rejected with the comment,

> The article on "Slave Labor at Angola Penn" has as the main theme organization and unity of inmates against correctional institutions. This philosophy guides individual inmates into situations which can cause themselves and other inmates problems with the posted regulations of this institution. Additionally, this type of material on institutions has a tendency to develop an adversary attitude by inmates toward staff, which can cause an unhealthy environment in this institution. This type of attitude is detrimental to the good orderly running of this institution.

(5) A rejection of a magazine in 1981 referred to material by page numbers, saying that it "depicts, describes or encourages activities which may lead to use of physical violence or group disruption." One of defendants conceded in testimony that "it should spell out more specifically the purpose of the rejection."

The Court said in *Martinez:*
> This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty.

416 U.S. at 414, 94 S.Ct. at 1811.

In our view, allowing such latitude, none of the comments just quoted constitutes a reasoned determination that the material encouraged conduct which would constitute, or otherwise was likely to produce, a breach of security or order or an impairment of rehabilitation.

The district court did not deal individually with the rejected publications. It wrote,

> Examination of the publications before the court confirms the proposition that publications can present a security threat. Not only the racial publications but materials concerning prison management and prison life often speak in strident, inflammatory terms; a warden might well find such publications too provocative for his institution at a given time. Other publications too might be dangerous to have on hand in a particular facility: A sexual magazine, for example, might be undesirable in an institution that has had a high incidence of sexual assault. The possible dangerous situations are as various as publications and circumstances at given institutions.

> The court therefore upholds the defendants' position that publications can present a security threat; and it also upholds the adoption of a standard that gives the warden wide discretion.

The court's generalized conclusions concerning the rejected materials logically follow from the court's conclusion that the deferential standards of *Pell, Jones, and Bell* control, and that plaintiffs had the burden of proving that defendants have "exaggerated their response" to problems rationally related to legitimate penological objectives. Although plaintiffs' experts testified to the effect that the defendants' rejection policy went further than necessary, the court gave greater weight to the testimony on behalf of defendants.

■ Our conclusion, however, is that although deference is to be accorded to defendants' expertise, they have the burden of showing that a rejection of a publication is at least "generally necessary to protect one or more of the legitimate governmental interests ..." of security, order, or rehabilitation. *Martinez*, 416 U.S. at 414, 94 S.Ct. at 1812. It follows that the rejections should have been addressed individually and none upheld unless consistent with *Martinez.*

We note, of course, that some of the rejections occurred as early as 1977. Many

of the items were periodicals current at that time. In several instances a defendant testified that in the light of changed circumstances a publication rejected in that period at one institution would not be rejected now. It may well be that there is no longer a real controversy over some of the publications. On remand the district court should determine whether and to what extent the individual rejections are moot. As to those which are not, the court should determine the propriety under *Martinez* of each rejection.

Insofar as the judgment appealed from denied relief on First Amendment grounds from rejection of publications, it is REVERSED and the cause REMANDED for further proceedings consistent with this opinion. In all other respects, the judgment is AFFIRMED. The parties shall bear their own costs on appeal.

### *ABBOTT* APPENDIX

28 C.F.R. § 540.70 (1986).

(a) The Bureau of Prisons permits an inmate to subscribe to or to receive publications without prior approval and has established procedures to determine if an incoming publication is detrimental to the security, discipline, or good order of the institution or if it might facilitate criminal activity. The term publication, as used in this rule, means a book (for example, novel, instructional manual), or a single issue of a magazine or newspaper, plus such other materials addressed to a specific inmate as advertising brochures, flyers, and catalogues.

(b) The Warden may designate staff to review and where appropriate to approve all incoming publications in accordance with the provisions of this rule. Only the Warden may reject an incoming publication.

28 C.F.R. § 540.71 (1986).

(b) The Warden may reject a publication only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity. The Warden may not reject a publication solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant. Publications which may be rejected by a Warden include but are not limited to publications which meet one of the following criteria:

(1) [It depicts or describes procedures for the construction or use of weapons, ammunition, bombs or incendiary devices;]

(2) It depicts, encourages, or describes methods of escape from correctional facilities, [or contains blueprints, drawings or similar descriptions of Bureau of Prisons institutions;]

(3) [It depicts or describes procedures for the brewing of alcoholic beverages, or the manufacture of drugs;]

(4) [It is written in code;]

(5) It depicts, describes or encourages activities which may lead to the use of physical violence or group disruption;

(6) It encourages or instructs in the commission of criminal activity;

(7) It is sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity.

\* \* \* \* \* \*

(c) The Warden may not establish an excluded list of publications. This means the Warden shall review the individual publication prior to the rejection of that publication. Rejection of several issues of a subscription publication is not sufficient reason to reject the subscription publication in its entirety.

(d) Where a publication is found unacceptable, the Warden shall promptly advise the inmate in writing of the decision and the reasons for it. The notice must contain reference to the specific article(s) or material(s) considered objectionable. The Warden shall permit the inmate an opportunity to review this material for purposes of filing an appeal under the Administrative Remedy Procedure unless such review may provide the inmate with information of a nature which is deemed to pose a threat or detriment to the security, good order or discipline of the

institution or to encourage or instruct in criminal activity.

(e) The Warden shall provide the publisher or sender of an unacceptable publication a copy of the rejection letter. The Warden shall advise the publisher or sender that he may obtain an independent review of the rejection by writing to the Regional Director within 15 days of receipt of the rejection letter. The Warden shall return the rejected publication to the publisher or sender of the material unless the inmate indicates an intent to file an appeal under the Administrative Remedy Procedure, in which case the Warden shall retain the rejected material at the institution for review. In case of appeal, if the rejection is sustained, the rejected publication shall be returned when appeal or legal use is completed.

The bracketed language in § 540.71(b) is not challenged by the plaintiffs.

Program Statement No. 5266.5 reads, in part, as follows:

(a) A Warden may determine that sexually explicit material of the following types is to be excluded, as potentially detrimental to the security, or good order, or discipline of the institution, or facilitating criminal activity:

(1) Homosexual (of the same sex as the institution population).

(2) Sado-masochistic.

(3) Bestiality.

(4) Involving children.

(b) The following points should be emphasized:

(1) It is the local Warden's decision (except for the child-model materials, which are prohibited by law)—a sexually explicit homosexual publication for example may be admitted if it is determined not to pose a threat at the local institution;

(2) Explicit heterosexual material will ordinarily be admitted;

(3) Sexually explicit material does not include material of a news or information type—publications covering the activities of gay rights organizations or gay religious groups, for example, should be admitted;

(4) Literary publications should not be excluded, solely because of homosexual themes or references, if they are not sexually explicit, and

(5) Sexually explicit material may nonetheless be admitted if it has scholarly value, or general social or literary value.