Joseph AMATEL, et al., Plaintiffs,

v.

Janet RENO, et al., Defendants.

Civil Action Nos. 96–2774(SS), 96–2790(SS), 97–00475(SS).

United States District Court,
District of Columbia.

Aug. 12, 1997.

Joseph Amatel, Pro Se, Marjorie Lynn Rifkin, Margaret Winter, Nat'l. Prison Project of the ACLU Foundation, Washington, DC, for Joseph Amatel.

Lee Alphonso Moore, Pro Se, Marjorie Lynn Rifkin, Margaret Winter, Nat'l. Prison Project of the ACLU Foundation, Ann Mary Kappler, Jenner & Block, for Lee Alphonso Moore.

Daniel J. Levitan, Pro Se.

Vincent Morgan Garvey, David Otto Buchholz, U.S. Dept. of Justice, Washington, DC, for Defendants.

### MEMORANDUM OPINION

SPORKIN, District Judge.

These consolidated cases involve First Amendment challenges to Section 614 of the Omnibus Appropriations Act of 1997, Pub.L. No. 104–208, § 614, 110 Stat. 3009 (Sept. 30, 1996), which prohibits the Federal Bureau of Prisons ("BOP") from using federal funds to "distribute or make available" to prisoners "commercially published information or material" known to be "sexually explicit or featur[ing] nudity." This provision, which was introduced by Representative John Ensign, has come to be known as the "Ensign Amendment."

Plaintiffs Joseph Amatel, Lee Alphonso Moore, and Daniel J. Levitan ("prisoner Plaintiffs") are incarcerated in federal pris-

ons. Since enactment of the Ensign Amendment, BOP staff have rejected several publications addressed to prisoner Plaintiffs. Plaintiffs Playboy Enterprises, Inc., General Media Communications and Periodical and Book Association of America, Inc. ("publisher Plaintiffs") publish or represent publishers of periodicals and other publications containing material that would be banned by the Ensign Amendment and its new implementing regulation. The publisher Plaintiffs have been notified that from now on their publications will not be delivered to inmates, and their publications will be routinely rejected by the BOP.

This matter is now before the Court on the Plaintiffs' motion for a preliminary/permanent injunction [1] to prevent enforcement of the Ensign Amendment, and Defendant's opposition thereto. The Court heard oral argument in this matter on June 25, 1997. For the reasons stated below, the Court finds that the Ensign Amendment, on its face, violates the First Amendment. Accordingly, the Court grants Plaintiffs' motion for permanent injunctive relief.

### FACTUAL BACKGROUND

Federal prison authorities have long monitored and controlled the distribution of publications inside prison walls. Distribution of publications in federal prisons is controlled pursuant to regulations originally issued by the BOP in 1979 ("1979 regulations"). 28 C.F.R. § 540.71. The 1979 regulations give wardens the authority to keep prisoners from receiving publications only if the wardens determine that the material is "detrimental to the security, good order, or discipline of the institution or if [the publication] might facilitate criminal activity." 28 C.F.R. § 540.71(b). The regulations also specifically forbid the rejection of "a publication solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant." *Id.*

The policy does not permit wardens to create a list of prohibited publications. Rather, each individual issue has to be reviewed by a warden prior to rejection. 28 C.F.R. § 540.71(c). While sexually explicit material can be rejected at a wardens discretion, the Program Statement expressly notes that sexually explicit heterosexual material will "ordinarily be admitted." [2] The Supreme Court upheld the constitutionality of the 1979 regulations in *Thornburgh v. Abbott,*

---

1. Although Plaintiffs seek permanent injunctive relief in their complaint, their written motion only seeks a preliminary injunction. At the hearing on this matter, the parties agreed that on the record before it, if the Court found the statute facially unconstitutional, it could grant permanent injunctive relief.

2. The Program Statement to the 1979 regulations stated that:
   (a) A Warden may determine that sexually explicit material of the following types is to be excluded, as potentially detrimental to the security, good order, or discipline of the institution, or facilitating criminal activity:
   (1) Homosexual (of the same sex as the institution population)
   (2) Sado-masochistic
   (3) Bestiality
   (4) Involving children.
   (b) The following points should be emphasized:
   (1) It is the local Warden's decision (except for the child-model materials which are prohibited by law)—a sexually explicit homosexual publication for example may be admitted if it is determined not to pose a threat at the local institution;
   (2) Explicit heterosexual material will ordinarily be admitted;
   (3) Sexually explicit material does not include material of a news or information type—publications covering the activities of gay rights organizations or gay religious groups, for example, should be admitted;
   (4) Literary publications should not be excluded, solely because of homosexual themes or references, if they are not sexually explicit, and
   (5) Sexually explicit material may nonetheless be admitted if it has scholarly value, or general social or literary value.
   (c) The Warden may not establish an excluded list of publications. This means the Warden shall review the individual publication prior to the rejection of that publication. Rejection of several issues of a subscription publication is not sufficient reason to reject the subscription publication in its entirety.
   Program Statement No. 5266.07, *reprinted in Abbott v. Meese,* 824 F.2d 1166, 1177 (D.C.Cir. 1987), *vac'd and remanded sub nom., Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).[3]

On September 30, 1996, President Clinton signed into law the Omnibus Budget Act of Fiscal Year 1997, P.L. 104–208, 110 Stat. 3009. Section 614 of the Act, known as the Ensign Amendment, states in its entirety:

> None of the funds made available in this Act to the Federal Bureau of Prisons may be used to distribute or make available any commercially published information or material to a prisoner when it is made known to the Federal official having authority to obligate or expend such funds that such information or material is sexually explicit or features nudity.

Pub.L. No. 104–208, § 614, 110 Stat. 3009 (Sept. 30, 1996).

The Ensign Amendment was enacted as an attachment to a comprehensive budgetary bill. No hearings were held by Congress in enacting the Ensign Amendments and no committee report was issued. No discussion of the statute appears in any Conference Report. The only statements made on the floor of the House regarding the Amendment reflect a desire on the part of the sponsors to keep sexually explicit material away from prisoners.[4] There is no record that any committee or the full Congress ever discussed how the banning of sexually explicit materials, in particular, will advance rehabilitative goals, or whether it is necessary to prevent distribution of such materials to all prisoners. Neither did Congress make any finding that rehabilitative goals were not being met by the 1979 regulations.

On November 6, 1996, the Federal Bureau of Prisons ("BOP") issued an interim rule that enacted 28 C.F.R. § 540.72, a regulation implementing the Amendment. Despite the new regulation, the 1979 regulations still remain in place except where they are inconsistent with the Ensign Amendment. *See* 28 C.F.R. § 540.70.

The new regulation specifically enforces the Ensign Amendment, requiring wardens to reject for distribution to any prisoner any sexually explicit publication or publication that "features" nudity. 28 C.F.R. § 540.72. Section (b) of the regulation defines the operative terms:

> (1) "Commercially published information or material" means any book, booklet, pamphlet. magazine, periodical, newsletter, or similar document, including stationery and greeting cards, published by any individual, organization, company, or corporation which is distributed or made available through any means or media for a commercial purpose. This definition includes any portion extracted, photocopied, or clipped from such items.
>
> (2) "Nudity" means a pictorial depiction where genitalia or female breasts are exposed.
>
> (3) "Features" means the publication contains depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues. Publications containing nudity illustrative of medical, educational, or anthropological content may be excluded from this definition.
>
> (4) "Sexually explicit" means a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex, or masturbation.

28 C.F.R. § 540.72(b). If the warden of an institution decides to reject a publication, the institution must give written notice to both the publisher or sender of the rejected materials, and the inmate-addressee. While an appeals process is provided for, the violative publications are sent back immediately. In-

---

**3.** As in this case, the Plaintiffs in *Thornburgh* were both federal prisoners and publishers of material that had been banned under the challenged regulations. *Thornburgh, supra* at 403, 109 S.Ct. at 1876. The Court analyzed the publishers' rights under the same "reasonableness" standard as the prisoners's rights. *Id.* at 410 n. 9, 413–14, 109 S.Ct. at 1880 n. 9, 1881–82.

**4.** Representative Christiansen stated that: "It is deplorable ... to think that America's Federal prisoners are granted access to vulgar, sexually explicit materials while serving time in our Federal prisons.... It is time to stop this ridiculous cycle of hypocrisy and end prisoner's access to sexually explicit materials. I believe this bill will make sure prisons are punishment, not playgrounds." *See* Cong. Rec. H8262 (July 24, 1996).

mates may not view the materials, even for the purpose of determining whether to appeal. 28 C.F.R. § 540.72(a).

### LAW & ANALYSIS

▇▇▇ As the Supreme Court held in *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), the appropriate standard of review for a statute or regulation limiting distribution in prisons of incoming publications is the *Turner v. Safley* reasonableness test. Such statutes and regulations are "valid if [they are] reasonably related to legitimate penological interests." *Turner,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). In order to make this determination, the Supreme Court has "identified several factors that are relevant to, and that serve to channel, the reasonableness inquiry." *Thornburgh,* 490 U.S. at 414, 109 S.Ct. at 1882. The first *Turner* factor, which must be satisfied, is whether "the governmental objective underlying the [statute or] regulations at issue is legitimate and neutral, and [whether] the [statute or] regulations are rationally related to their objective." *Id.* Only if the first factor is satisfied does the Court consider the other three factors: "whether there are alternative means of exercising the right that remain open to prison inmates," *id.* at 417, 109 S.Ct. at 1884; "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison," *id.* at 418, 109 S.Ct. at 1884; and "the existence of obvious, easy alternatives." *Id.*

### Legitimate penological interest

▇▇ The legitimate penological interest posited by the Government for the Ensign Amendment and the interim rule is "rehabilitation" of prisoners, In *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974), the Supreme Court listed as "substantial" government interests, "security, order, and *rehabilitation.*" *Martinez* was overruled in part by *Thornburgh, supra* at 413–14, 109 S.Ct. at 1881–82, holding that "strict scrutiny" analysis should not be applied to all prison regulations affecting First Amendment rights. Nonetheless, the *Thornburgh* decision did not have any bearing on the holding of the Court in *Martinez*

that rehabilitation is a "substantial," and by extension. "legitimate" government penological interest. Accordingly, "rehabilitation" is a "legitimate" penological interest for the purpose of the *Turner* analysis.

### Neutrality

Addressing the neutrality prong of *Turner,* the Court in *Thornburgh* found it to be a "close[ ]" question whether even the 1979 regulations were neutral. *Thornburgh, supra* at 415, 109 S.Ct. at 1882. The Court stated:

> On their face, the regulations distinguish between rejection of a publication "solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant" (prohibited) and rejection because the publication is detrimental to security (permitted). Both determinations turn, to some extent, on content.... [P]rison administrators draw distinctions between publications solely on the basis of their potential implications for prison security [and therefore] the regulations are "neutral" in the technical sense in which we meant and used the term in *Turner.*

*Id.* at 415–16, 109 S.Ct. at 1882–83 (internal citation omitted). Following this analysis, the question this Court must address is whether Congress in enacting the Ensign Amendment "dr[e]w distinctions between publications *solely* on the basis of their potential implications for [rehabilitation]." (emphasis added). In face of the legislative history behind the Ensign Amendment and the plain language of the Amendment, this Court concludes that distinctions on the basis of content were not drawn solely with a view to the implications for rehabilitation. Rather, the Ensign Amendment is a content-based statute with a sole focus on the sexual nature of the publications it seeks to prohibit.

The Ensign Amendment on its face does exactly what the 1979 regulations did not do: it restricts materials based solely on sexual content. Nothing in the statute or its history indicates any finding by Congress, or even belief on its part, that prohibition of sexually explicit materials or those featuring nudity

would have further rehabilitative goals in a manner that prohibition of other materials would not.

Looking first to the legislative history, the sponsors could not have been more plain in their intent: they believed that restricting sexually explicit materials would make prisons more punitive. Regardless of the merit of this argument as a matter of fact, it is clear that as a matter of law, any such concerns cannot be addressed without considering the legitimate First Amendment rights of prisoners.

The government attempt to define the scope of the statute through the new regulation does not cure it of is non-neutral nature. For example, in the revised Program Statement issued in conjunction with the new regulation, the BOP draws a curious distinction between certain publications, banning magazines such as Playboy and Penthouse, but permitting publications such as the Sports Illustrated Swimsuit Issue and the Victoria Secret catalogue. Program Statement 5266.07 at 7 (Nov. 1, 1996) (Appendix I to Defendants' Motion to Dismiss). While there is little doubt that Playboy and Penthouse have stronger sexual content, there is no reason to believe that they are any more or less rehabilitative than the latter two publications. If rehabilitation was the content neutral goal of the Ensign Amendment, then presumably it would ban all non-rehabilitative publications. If anything, the distinction drawn by the new program statement further emphasizes the non-neutral nature of the Ensign Amendment.

The Court is certainly sensitive to the fact that certain prisoners should not receive certain sexually explicit materials. Furthermore, there are certain sexually explicit materials that *no* prisoner should receive. The government won its right to pursue those concerns in *Thornburgh* when the Supreme Court upheld the 1979 regulations. Those regulations took a common sense approach: they gave wardens the discretion to keep sexually explicit materials from sexual predators and to restrict certain materials that posed security risks. Unfortunately, the Ensign Amendment does not take this careful, constitutionally-sensitive approach.

Because the Court finds that the Ensign Amendment violates the "neutrality" prong of the *Turner* test, it is not necessary to reach the remaining factors. Even if the statute was deemed to be "neutral," it is significant that under the broad terms of the statute and regulation, the materials banned do not need to be "obscene" or "pornographic." Accordingly, any publication that is deemed to contain sexually explicit language or nudity comes within the Ensign prohibition. It is doubtful that this broad incursion on the First Amendment could pass constitutional muster.

### CONCLUSION

It is of concern to this Court that this law ignores the history of careful and time-tested regulation and replaces it with a hastily-drafted statute tagged on to a massive budget bill. It is clear that this Amendment had nothing to do with budgetary concerns. The cost of monitoring materials, returning them to their publishers and mailing out notifications clearly exceeds the *de minimis* cost of simply distributing publications. It is also clear that the Amendment was passed with little consideration of its consequences. There was no Congressional finding that the old regulations were deficient in some manner. There was no Congressional finding that this Amendment would serve a rehabilitative purpose, or any other purpose. There was no investigation into the practical concerns raised in enforcing such a statute.[5] And there was no consideration of the Con-

---

5. It is the Court's understanding that the way the Bureau of Prisons intends to discharge its obligations under the law is to ban outright certain well-known adult periodicals, such as Playboy and Penthouse. The Bureau successfully argued in *Thornburgh v. Abbott, supra* at 418–19, 109 S.Ct. at 1884–85. that tearing out rejected pages from a publication would create too much discontent among prisoners and is not, therefore, a reasonable alternative to an "all-or-nothing" rule. But even assuming, *arguendo*, that there is some basis for keeping from prisoners the pages of Penthouse and Playboy that contain nudity or sexually explicit language, it is hard to envision any First Amendment rationale for restricting the non-offending, non-sexual articles often found in such publications.

stitutional concerns raised by such legislation.

Because the Court finds that the Ensign Amendment is not "neutral," the Court holds, pursuant to *Turner v. Safley, supra,* that it is facially violative of the First Amendment. Accordingly, the Court declares the Ensign Amendment unconstitutional, and grants Plaintiffs' motion for permanent injunctive relief. An appropriate order follows this Memorandum Opinion.

## *ORDER*

This matter is before the Court on Plaintiffs' motion for declaratory judgment and permanent injunctive relief and Defendants' cross-motion to dismiss. For the reasons stated in the attached Memorandum Opinion, the Court hereby

**DECLARES** that Section 614 of the Omnibus Appropriations Act of 1997, Pub.L. No. 104–208, § 614, 110 Stat. 3009 (Sept. 30, 1996) (the "Ensign Amendment") to be facially violative of the First Amendment to the United States Constitution. Accordingly, it is hereby

**ORDERED** that the Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, be **PERMANENTLY ENJOINED** from enforcing Section 614 of the Omnibus Appropriations Act of 1997, Pub.L. No. 104–208, § 614, 110 Stat. 3009 (Sept. 30, 1996) (the "Ensign Amendment"). Because there are no further outstanding issues in this case, it is further

**ORDERED** that this case be **DISMISSED.**